**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CLAUDIA ASSOULINE, <br><br> Plaintiff, <br> v. <br><br> REGENLAB USA LLC and ANTOINE TURZI, in his individual and professional capacities, <br><br> Defendants. | Civil Case No.: <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Claudia Assouline, by and through her undersigned counsel, hereby alleges as follows against Defendants RegenLab USA LLC ("RegenLab USA" or the "Company") and Antoine Turzi (collectively, "Defendants"):

**PRELIMINARY STATEMENT**

1. On November 12, 2020, RegenLab USA fired Ms. Assouline from her position as its Technical Director, less than two weeks after its Chief Executive Officer Antoine Turzi learned she was pregnant.

2. Mr. Turzi first learned Ms. Assouline was pregnant on or around November 1, 2020. He immediately began raising false concerns about her performance and pressured her to reduce her work schedule. He also told her that she could not handle certain responsibilities because of her "family."

3. On November 9, 2020, Mr. Turzi told Ms. Assouline that he dealt with the "problem" of pregnant employees in Europe by reducing their hours and that she should reduce her hours due to the pregnancy. Ms. Assouline did not agree to the reduction in her schedule.

4. After Ms. Assouline resisted the reduction in her hours, Mr. Turzi removed her direct reports, eliminated some of her job duties, and instructed her that she would need to complete

1

a timesheet every day. He then asked her to sign a new contract that would have cut her schedule and her compensation in half.

5. On November 12, 2020, Mr. Turzi threatened Ms. Assouline that she would be fired if she did not sign the new contract that day. Ms. Assouline asked for a few days to review the agreement. She knew Mr. Turzi was forcing the reduced schedule because of her pregnancy and needed time to understand her rights in the situation. Mr. Turzi refused to give Ms. Assouline time to review the agreement and fired her on the spot.

6. Defendants' unlawful termination of Ms. Assouline is emblematic of the Company's misogynistic culture. Mr. Turzi made sexist comments about Ms. Assouline and other women, undermined Ms. Assouline's leadership because of her gender, and sidelined pregnant workers. Indeed, another female employee once confided in Ms. Assouline that she did not want to have another child because she feared Mr. Turzi's reaction.

7. Accordingly, Ms. Assouline files this action seeking redress for discrimination and retaliatory conduct committed by Defendants in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq.* ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL").

**JURISDICTION AND VENUE**

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII. The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

9. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 as there is diversity of citizenship between Plaintiff (a resident of the state of New Jersey), and Defendants (a corporation with its headquarters in New York and an individual resident of Switzerland), and this action involves a matter in controversy that exceeds the sum of $75,000.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PREREQUISITES

11. On September 3, 2021, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII.

12. On November 8, 2021, Plaintiff received a Notice of Right to Sue from the EEOC. Fewer than 90 days have passed since Plaintiff received the Notice of Right to Sue.

13. Following commencement of this action, a copy of this Complaint will be served on the New York City Commission on Human Rights and the Office of Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the NYCHRL.

## PARTIES

14. Plaintiff Claudia Assouline is a former employee of RegenLab USA who worked at RegenLab USA's headquarters in Brooklyn and remotely from her prior residence in Manhattan. At all relevant times, Plaintiff met the definition of "employee" under all relevant statutes. Plaintiff now resides in the State of New Jersey.

15. Defendant RegenLab USA LLC is a Delaware limited liability company with its principal place of business at 140A 58th Street, Brooklyn, New York 11220. At all relevant times, RegenLab USA LLC has met the definition of "employer" under all relevant statutes.

16. Defendant Antione Turzi is the Chief Executive Officer of RegenLab USA LLC and resides in Switzerland. At all relevant times, Turzi has met the definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

### I. Background

17. RegenLab USA is the U.S. division of RegenLab SA, a global biotech company that manufactures medical devices used in regenerative cell therapy and autologous platelet-rich plasma (PRP) treatments. Mr. Turzi is the founder and Chief Executive Officer of RegenLab SA and RegenLab USA.

18. Ms. Assouline is a skilled Doctor of Pharmacy who has focused her education and career on pharmaceutical industry and biotechnology. She graduated from Aix-Marseille University's pharmaceutical school with the highest honors and was one of the top students in her class. She obtained a Master of Arts in Biotechnology from Columbia University and worked as a researcher at Columbia University Medical Center and Mount Sinai Hospital.

### II. RegenLab Hires Ms. Assouline

19. In or around 2019, RegenLab USA began preparing to manufacture its medical devices and accessories for the first time in the U.S. The Company planned to build a laboratory at its office space in Brooklyn Army Terminal.

20. In November 2019, RegenLab USA hired Ms. Assouline as its Technical Director. This role was responsible for, among other things, developing and overseeing production and quality assurance processes at the Brooklyn facility, training employees, and ensuring compliance with FDA requirements. Mr. Turzi told Ms. Assouline that she would also be responsible for managing the new laboratory when it was finished.

21. As Technical Director, Ms. Assouline reported directly to Mr. Turzi, who primarily worked in Europe. Upon information and belief, Ms. Assouline was the only employee at the Brooklyn facility with relevant technical education or experience prior to working at RegenLab USA.

22. Mr. Turzi instructed Ms. Assouline that the U.S. production and quality assurance protocols should replicate those used at RegenLab's Swiss headquarters as much as possible. Accordingly, Ms. Assouline worked closely with RegenLab SA's Technical Director and Lead Engineer, both in Switzerland, as she developed the standard operating procedures (SOPs) for the U.S.

23. Mr. Turzi approved a weekly schedule for Ms. Assouline consisting of two days in the office and three days remote. Many of Ms. Assouline's job duties were well suited to remote work, such as taking early calls with her colleagues in Switzerland and writing procedures.

24. Ms. Assouline typically worked in the Brooklyn office three days per week, more than required. She maintained this schedule even when the Covid-19 pandemic hit and most RegenLab USA employees worked from home.

**III.  Ms. Assouline's Job Performance**

25. Ms. Assouline was a devoted employee who consistently worked hard and performed well at RegenLab USA. Prior to learning of her pregnancy, Mr. Turzi was pleased with her work and never raised any issues or concerns about her.

26. For example, in or around March 2020, Mr. Turzi told Ms. Assouline that RegenLab USA would begin fulfilling U.S. orders from the Brooklyn facility, with stock from the Swiss headquarters, and that the first stock shipment would arrive from Switzerland in two weeks.

Mr. Turzi made Ms. Assouline responsible for creating a warehouse, managing stock and shipping, and hiring and training warehouse employees.

27.  In only two weeks, Ms. Assouline successfully prepared the Brooklyn warehouse and drafted the appropriate SOPs for receiving, storing and shipping stock of medical devices and accessories. She also hired and trained a warehouse manager and other employees to handle all aspects of stocking and distribution, in accordance with the SOPs.

28.  Mr. Turzi was impressed with Ms. Assouline's work in getting the warehouse and distribution up and running on short notice. He told the new employees that she was his "right hand," and they should follow her instructions in all aspects of the Company's products. She continued to be responsible for U.S. distribution going forward, in addition to her other job duties.

29.  Mr. Turzi routinely called Ms. Assouline to discuss her work and never raised any performance concerns. As one example only, during a call on or about June 2, 2020, Mr. Turzi commended Ms. Assouline's implementation and management of U.S. distribution. In light of her excellent work, he said that he wanted to make sure she was happy in her role and asked if she was being paid enough. He also invited her and her family to stay at his apartment in Italy over the summer. She politely declined.

30.  Ms. Assouline's professional colleagues also held her in high regard. For example, RegenLab SA's Technical Director and Lead Engineer worked directly with Ms. Assouline on a regular basis. They were complimentary of her work and had significant trust in her.

**IV.  Mr. Turzi Raises False Performance Issues After Learning of Ms. Assouline's Pregnancy**

31.  In the summer of 2020, Ms. Assouline learned that she was pregnant, due in April 2021. Unfortunately, this joyous news ultimately detailed her career at RegenLab USA.

32. Mr. Turzi first learned that Ms. Assouline was pregnant on or about November 1, 2020, when he arrived in New York for a two-week business trip. By this time, Ms. Assouline was four months pregnant and visibly showing. Upon information and belief, other RegenLab employees already knew that she was pregnant, and one of them told Mr. Turzi not long before he saw her in person at the Brooklyn office.

33. After learning of the pregnancy, Mr. Turzi quickly began to raise false performance concerns about Ms. Assouline. For example, on November 2, 2020, Mr. Turzi told her that he "heard" she was not getting all of her work done and was not coming to the office. This was the first time that he raised any issues regarding Ms. Assouline's productivity or attendance in the office.

34. It was not true that Ms. Assouline was "not coming to the office." She was typically working in the office at least three days per week, which was more than required under her agreed upon schedule. Notably, Mr. Turzi never told her – in this conversation or at any time – that he wanted her to be in the office more often.

35. As for her productivity, Mr. Turzi claimed that he "heard" that she was spending too much time on quality assurance protocols for RegenLab USA's medical devices and accessories. This was another false concern. It was Ms. Assouline's job to ensure that the Company's quality assurance protocols were followed prior to releasing products for shipment. Ms. Assouline designed these protocols to follow those used Swiss headquarters, as instructed by Mr. Turzi.

36. Although Ms. Assouline had been following the same quality assurance procedures for months, it was only after learning of the pregnancy that Mr. Turzi had any purported issue with the amount of time they required.

### V. Mr. Turzi Removes Ms. Assouline's Job Duties and Hours

37. Mr. Turzi also discriminated against Ms. Assouline by removing her job duties and pressuring her to reduce her work schedule because of her pregnancy.

38. On November 4, 2020, Mr. Turzi told Ms. Assouline that she would no longer be responsible for overseeing RegenLab USA's laboratory, once it was finished. He told her **"you will not be able to manage the lab because you have your family."** There was, of course, no "family" reason that Ms. Assouline would not be able to manage a lab.

39. In the same conversation, Mr. Turzi pressured Ms. Assouline to reduce hours from 80% to 60%. Ms. Assouline did not want or need to reduce her schedule and declined.

40. On November 9, 2020, Mr. Turzi again pressured Ms. Assouline to reduce her hours. This conversation began with Ms. Assouline telling Mr. Turzi that she was pregnant and due in April – unaware that Mr. Turzi knew already. He told her that he and everyone in the office knew about the pregnancy, and revealed that the pregnancy was the reason he had been asking to reduce her hours. He explained, **"we had this problem [pregnant employees] in Switzerland and they reduced their hours**." Ms. Assouline declined, again, to reduce her hours, and assured Mr. Turzi that she would let him know if her needs changed in the future.

41. When Ms. Assouline resisted reducing her schedule, Mr. Turzi reacted in classic retaliatory fashion. The next day, he effectively demoted Ms. Assouline and announced that she would no longer be responsible for the Company's warehouse, manufacturing, or laboratory. He also removed her two direct reports – a warehouse manager and a warehouse technician – and said that all three of them would be deemed the same level going forward.

42. Mr. Turzi then directed Ms. Assouline to start completing a timesheet every day. Upon information and belief, no similarly situated employees were required to keep timesheets.

43. Mr. Turzi ignored Ms. Assouline's decision to keep her current schedule. On November 11, 2020, the Company's Office Manager, Jessica Zayes, sent Ms. Assouline an amended employment contract and offer letter. Under the new contract, Ms. Assouline's schedule would be reduced to only two days per week, cutting both her hours and compensation in half. The offer letter stated that she had only two business days to accept or reject the offer.

44. On November 12, 2020, Mr. Turzi abruptly called Ms. Assouline into his office and yelled at her for purportedly "impairing work and shipment." Mr. Turzi was apparently referring to Ms. Assouline requiring the proper approval to release a medical device shipment. Her practice was consistent with both RegenLab USA's SOPs and the procedures required by the Swiss headquarters. She was not "impairing" work or shipment; she was doing the work necessary for the shipment to be released.

45. Mr. Turzi then told Ms. Assouline that Company was reducing her schedule to two days per week. He asked if she agreed to the change. Ms. Assouline reluctantly said that she felt she had no choice. The only alternative was termination.

46. Shortly thereafter, Ms. Zayes sent Ms. Assouline an email marked with "high" importance stating that Mr. Turzi had "confirmed [her] 2 Workday week" and asked Ms. Assouline to meet in her office to sign four documents to "complete and solidify this contract." The email listed those four documents (IP agreement, employment offer letter, employment agreement, and timecard policy), but none of them were attached to the email.

47. Ms. Assouline responded to Ms. Zayes: "I need time to review the documents. Could you send them to me? I will read them this weekend when not working and will come by your office on Tuesday."

48. Mr. Turzi replied to her email, stating: **"You have to confirm today the agreement, if not I have to take another decision."** Before she could respond, Mr. Turzi approached Ms. Assouline in person and threatened to terminate her if she did not sign the contract right then. She was not even given two business days, as promised in the offer letter, to review.

49. Ms. Assouline knew that Mr. Turzi was insisting on the reduction in her schedule because of her pregnancy. She wanted to protect her rights and was not comfortable signing any documents without sufficient time to review. Thus, she said that she could not sign the contracts that day.

## VI. Defendants' Unlawful Termination of Ms. Assouline

50. In a blatant act of discrimination and retaliation, Mr. Turzi terminated Ms. Assouline's employment on the spot, effective immediately, November 12, 2020. Her termination came less than two weeks after Mr. Turzi learned of her pregnancy.

51. Defendants provided shifting explanations for her termination. Mr. Tuzi told Ms. Assouline that she was being fired because she asked for time to review the contracts. However, the same day, Ms. Assouline received a termination letter falsely claiming she was fired "for cause" and for "poor work performance." The letter also stated, "the requirements we have been [sic] set forth have not been met with significant improvement."

52. The alleged performance reasons for Ms. Assouline's termination were false. Defendants never identified any requirements that Ms. Assouline was not meeting, nor was she given a chance to improve on any alleged performance issues.

53. Ms. Assouline's colleagues were shocked and upset by her sudden termination. Multiple employees contacted her and expressed concern that the only U.S. employee qualified to run the quality assurance process had been fired. The Warehouse Manager informed her that he

quit immediately after she was fired because his job could not be performed without her ensuring quality control.

### VII. The Toxic Environment at RegenLab USA

54. The discrimination against Ms. Assouline was, unfortunately, merely part of the misogynistic and toxic environment at RegenLab USA.

55. Mr. Turzi regularly made unwelcome comments about whether he found female employees, including Ms. Assouline, attractive. He often commented on the appearance of female employees, and on at least one occasion, announced that he was so "lucky" to have so many "beautiful" women working for him. In July 2020, when Ms. Assouline visited the Company's Swiss headquarters, Mr. Turzi remarked, in front of her colleagues, that she looked radiant and beautiful.

56. Mr. Turzi also disrespected and undermined Ms. Assouline as a leader, based on her gender. For example, in or around March 2020, Mr. Turzi joked to one of Ms. Assouline's male subordinates about him having to report to a woman – implying that men should have more power than women.

57. Mr. Turzi also undermined Ms. Assouline by excluding her from important conversations and decisions. He held "man to man" conversations with her male direct reports and did not let her join. On one occasion, Mr. Turzi instructed one of her male direct reports that he should be present at all times to "protect the women."

### VIII. Ongoing Retaliation Against Ms. Assouline Since Her Termination

58. Since her unlawful termination, Defendants have retaliated against Ms. Assouline by trying to intimidate her.

59. On or about December 21, 2020, Defendants received a letter from Ms. Assouline's counsel asserting her claims against them. Two days later, Mr. Turzi contacted Ms. Assouline's father by email, indicating that Defendants would be billing her for the costs of training she received in her employment.

60. Mr. Turzi's message was plainly intended to intimidate Ms. Assouline and dissuade her from pursuing her rights further. There is no legitimate reason that Ms. Assouline or her father would be expected or required to repay costs the Company incurred in her training.

61. Defendants also retaliated against Ms. Assouline by filing a false workers compensation claim on her behalf. Upon information and belief, Defendants filed a claim on or about December 7, 2021 stating that Ms. Assouline suffered multiple physical injuries to multiple body parts on November 12, 2020, her last day of employment. Defendants were aware that no such physical injuries had occurred when they filed this claim with their workers compensation carrier.

**FIRST CAUSE OF ACTION**
Discrimination in Violation of Title VII
*Against Defendant RegenLab USA*

62. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

63. By the actions described above, among others, Defendant RegenLab USA discriminated against Plaintiff on the basis of her sex and/or pregnancy in violation of Title VII by, *inter alia,* terminating her employment.

64. Defendant RegenLab USA refused to accommodate Plaintiff's pregnancy by fabricating performance issues and terminating her employment on the basis of her becoming pregnant.

65. As a direct and proximate result of Defendant RegenLab USA's unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

66. As a direct and proximate result of Defendant RegenLab USA's unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

67. Plaintiff is further entitled to an award of punitive damages as Defendant RegenLab USA's unlawful conduct constitutes malicious, willful and wanton violations of Title VII.

## SECOND CAUSE OF ACTION
Retaliation in Violation of Title VII
*Against Defendant RegenLab USA*

68. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

69. By the actions described above, among others, Defendant RegenLab USA retaliated against Plaintiff in violation of Title VII by, *inter alia,* terminating her employment in retaliation for her protected activity.

70. As a direct and proximate result of Defendant RegenLab USA's unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

71. As a direct and proximate result of Defendant RegenLab USA's unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

72. Plaintiff is further entitled to an award of punitive damages as Defendant RegenLab USA's unlawful conduct constitutes malicious, willful and wanton violations of Title VII.

## THIRD CAUSE OF ACTION
### Discrimination in Violation of NYSHRL
*Against All Defendants*

73. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

74. By the actions described above, among others, Defendants discriminated against Plaintiff based on her sex and/or pregnancy in violation of the NYSHRL, by, *inter alia,* terminating Plaintiff's employment.

75. Defendants refused to accommodate Plaintiff's pregnancy by fabricating performance issues and terminating her employment on the basis of her becoming pregnant.

76. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

77. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

78. Plaintiff is further entitled to an award of punitive damages as Defendants' unlawful conduct was and remains reckless, wanton and/or malicious.

## FOURTH CAUSE OF ACTION
### Retaliation in Violation of NYSHRL
*Against All Defendants*

79. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

80. By the actions described above, among others, Defendants retaliated against Plaintiff in violation of the NYSHRL, by, *inter alia*, terminating Plaintiff's employment in retaliation for her protected activity.

81. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

82. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

83. Plaintiff is further entitled to an award of punitive damages as Defendants' unlawful conduct was and remains reckless, wanton and/or malicious.

## FIFTH CAUSE OF ACTION
Aiding and Abetting in Violation of NYSHRL
*Against Defendant Turzi*

84. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

85. Defendant Turzi knowingly and maliciously aided and abetted the unlawful employment practices, discrimination and retaliation against Plaintiff in violation of the NYSHRL.

86. As a direct and proximate result of Defendant Turzi's unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

87. As a direct and proximate result of Defendant Turzi's unlawful conduct, has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

88. Plaintiff is further entitled to an award of punitive damages as Defendant Turzi's unlawful conduct was and remains reckless, wanton and/or malicious.

## SIXTH CAUSE OF ACTION
Discrimination in Violation of NYCHRL
*Against All Defendants*

89. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

90. By the actions described above, among others, Defendants discriminated against Plaintiff based on her gender and/or pregnancy in violation of the NYCHRL by, *inter alia,* terminating Plaintiff's employment.

91. Defendants refused to accommodate Plaintiff's pregnancy by fabricating performance issues and terminating her employment on the basis of her becoming pregnant.

92. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

93. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

94. The unlawful actions of Defendants were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
Retaliation in Violation of NYCHRL
*Against All Defendants*

95. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

96. By the actions described above, among others, Defendants retaliated against Plaintiff in violation of the NYCHRL by, *inter alia,* terminating her employment in retaliation for her protected activity.

97. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

98. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

99. The unlawful actions of Defendants were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
Aiding and Abetting in Violation of NYCHRL
*Against Defendant Turzi*

100. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

101. Defendant Turzi knowingly or recklessly aided and abetted the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYCHRL.

102. As a direct and proximate result of Defendant Turzi's unlawful conduct, Plaintiff has suffered and continues to monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

103. As a direct and proximate result of Defendant Turzi's unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

104. Defendant Turzi's unlawful aiding and abetting constitutes malicious, willful, wanton and reckless violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants and grant the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B. An injunction and order permanently restraining Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including mental anguish and emotional distress;

E. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

F. An award of punitive damages, in an amount to be determined at trial;

    G.    Prejudgment interest on all amounts due;

    H.    An award of Plaintiff's reasonable attorneys' fees and cost to the fullest extent permissible by law; and

    I.    Such other and further relief and the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: New York, New York
February 2, 2022

KAUFMAN LAW FIRM PLLC

s/ Meredith L. Kaufman
Meredith L. Kaufman
250 W. 16th St., 2G
New York, NY 10011
Tel: 646.469.9180
meredith@kaufmanlawnyc.com

*Attorneys for Plaintiff*